Pearson, J.
 

 In 1806, Benjamin Smith, having title to a • large body of land in the County of Brunswick, (about 60,000
 
 *76
 
 acres,) for a valuable consideration, conveyed the same to John Q. Blount, the ancestor of the plaintiffs.
 

 In 1819, Blount and James J. McKay, the intestate of the defendant, executed a covenant by which McKay agreed, “at his own expense, to examine the title of Blount to the said land, explore, sell and convey, the same, ór any part thereof, upon such terms as he might deem advisable, and make return to the said Blount in the month of February, (in each and every year,) of all sales and payments towards the same, and
 
 account with the said JBlount, his heirs and executors,
 
 &c., for his one-half of said sales,” deducting expenses. Blount, at the same time, executed to McKay a power of attorney to make title, with warranty, to the land, in such parts or parcels thereof, as he might, from time to time, make sale of.
 

 In 1830 the sheriff of Brunswick County (sold the land under an execution upon a judgment in favor of Robert Hare against Mary Grimke, the devisee of the said Benjamin Smith, and McKay became the purchaser thereof at about the price of $49.
 

 In 1832 Blount died, leaving the plaintiffs his heirs-at-law and devisees.
 

 In 1845 the sheriff of Brunswick exeeirted a deed to McKay for the land.
 

 In 1853 McKay sold the land to one Bag-ley and others, for $10,000, and soon thereafter died.
 

 McKay had put tenants on the land, who continued in possession for more than seven years before his sale to Bagley.
 

 The bill was filed at Spring Term, 1854, alleging these facts, and praying that the defendant, as administrator of McKay, 'should account for the one-half of the aniouiit of sales according to the covenant executed by Blount and McKay.
 

 The defendant in his answer insists, admitting the facts as above stated, that, by the death of Blount, the power of attorney was revoked, and the previous relation existing between the parties thereby terminated ; that under the sheriff’s deed
 
 *77
 
 as color of title, and tbe possession held under it, his intestate had acquired title, and he insists that .lie is protected by the statute of limitations and the lapse of time. He avers that his intestate, in the latter part of his life-time, claimed the land as his own, and sold it on his own account, and not on account of the plaintiffs, or in pursuance of the covenant and power of attorney. The parties lived a considerable distance from each other, and there was no communication between them in reference to the land, until after the sale, when defendant’s intestate delivered up the deed of Benjamin Smith to Blount, which deed he had received at the time the covenant was executed, and had retained ever since, and refused to pay over any portion of the proceeds of the sale.
 

 It is proved by the testimony of
 
 Mr.
 
 Biggs, that McKay sold the land as his own, and did not profess to act under the covenant and power of attorney. Mr. Biggs says that,
 
 “
 
 during the negotiation for the purchase of the land, General McKay alluded to Blount’s claim, and showed him the covenant and power of attorney, and also the deed of Smith to Blount, and enquired who were the heirs of Blount,” and
 
 “
 
 seemed to fear that if he completed the trade as proposed, he might have some difficulty with them.”
 

 The mere statement of the case is sufficient to show that the plaintiffs are entitled to the relief prayed for, unless their right is barred by the statute of limitations, or lost by the lapse of time. Mr. McKay, in his conversation with Mr. Biggs,
 
 fdt this.
 
 He feared if he completed the trade as proposed, that he might have some difficulty with the heirs of Blount.
 

 The purchase of McKay, at the sheriff’s sale in 1830, was in Blount’s life-time; the covenant and power of attorney were then in full force and effect, and of course, McKay could not thereby acquire any title in himself adverse to that of Blount. The purchase is referrable to the relation then existing between the parties, as a mode of removing an incum-brance, or quieting the title of Blount, at a small expense. This results from a principle familiar both at Law and Equi-
 
 *78
 
 1y, i. e., when an act admits of two constructions, one rightful and the other wrongful, the rightful character will be imputed to the act, and the party will not be heard to aver that he acted wrongfully, or be allowed to take advantage of his own wrong.
 

 So, the fact that McKay put tenants on the land, for the purpose of holding possession, is attributable to the relation between the parties; and although McKay, in 1845, took the deed from the sheriff in his own name, still the possession of these tenants cannot have, the effect of defeating the title of Blount, which was good, and of ripening a bad title, which McKay, at that time, saw proper to take in his own name. It may be that he took this deed in his own name as a matter of convenience, not knowing who were the heirs of Blount. Such would be the natural inference, but for subsequent events.
 

 Admit, however, that he had then formed the purpose of defeating the right of Blount’s heirs, and to that end, took the deed in his own name, and then, for the first time, put tenants on the land, (although it does not distinctly appear, either from the pleadings or proofs, when possession was taken by these tenants,) still it required seven years’ possession, under this deed as color, to perfect the title, and devest the legal title of the heirs. This brings it down to 1852, before McKay had the legal title, and at that time the heirs having, as is supposed, lost the legal title, would be forced into a Court of Equity, to assert the right of converting him into a trustee. This bill was filed within two years thereafter, so their right in Equity was not barred, and the question is, were they entitled, in Equity, to convert him into a trustee ?
 

 "We think their equity very clear. By the death of Blount the power of attorney to McKay was revoked, but the
 
 coven
 
 ant, executed by the parties, still subsisted, and the confidential relation, created thereby, continued. It is true, McKay had made no
 
 returns
 
 of
 
 sales
 
 and
 
 payments,
 
 and had held no communication, either with Blount or his heirs, for a long space of time ; but there were no returns of sales and pay-
 
 *79
 
 meats to make, as be bad effected no sales, and tbe obligation, on tbe part of McKay, to account with Blount, bis
 
 heirs
 
 and
 
 executors,
 
 for the one-half of tbe proceeds of sales, was still in full force, and had never been released, satisfied, or abandoned. It is familiar doctrine, acted upon both at Law and in Equity, that when a confidential relation is established between parties, either by act of law, as in the case of coparce-ners, tenants in common, &c., or by agreement of the parties as in case of a trust, or agency, the rights incident to that relation, continue until the relation is put an end to, and the statute of limitations and lapse of time, have no application.
 
 Northcott v. Casper,
 
 6 Ire. Eq. Rep. 303; Adams’ Equity.
 

 The plaintiffs’ equity, therefore, is not barred by the statute of limitations, or lost by the lapse of time, even upon the supposition that McKay had a right to assume an adversary position, and acquire title for himself under the sheriff’s deed.
 

 But we wish not to be understood as conceding that point. A lessee for years, after the expiration of the time, is not at liberty to turn upon his landlord and hold adversely, until he has first
 
 surrendered
 
 up the possession acquired by means of the lease. A bailee cannot, by an act of his own, make himself a wrong-doer, so as to acquire any rights incident to an adverse possession. The bailor may, at his election, treat him as a wrong-doer, but the bailee cannot make the averment, for no man shall take advantage of his own wrong.
 

 It is upon this principle that the doctrine of “ tenancy by sufferance” is based. After the determination of the estate, the tenant holding over, is still considered as a
 
 tenant,
 
 and can acquire no rights upon the footing of an adverse possession ; he is required first to give back the possession, and put the landlord m
 
 statu quo.
 

 Upon this principle, which is universal, (for it is one of common honesty,) McKay could acquire no rights by means of his deed and the possession of his tenants, until he had put an end to the confidential relation, created between himself and Blount, by force of the covenant. He took no steps for this purpose; on the contrary, he retained the title papers, allow
 
 *80
 
 ed tbe covenant to remain outstanding, and had it in his power at any time when he effected a sale, although the power of attorney was revoked by Blount’s death, to compel Blount’s heirs to make title to the purchaser, and divide the proceeds of sale according to the stipulation of the covenant. The idea that he, by remaining inactive in. reference to Blount and. his heirs, and making
 
 no
 
 communication to them, from 1819 to 1853, which he was under a positive obligation to do-during that time, could contrive to acquire title in himself, and thereby have a right, when he did effect a sale, to appropriate the whole of the proceeds to- himself, and repudiate his obligation to Blount, cannot, for one moment, be entertained,, there being no allegation or proof,, that Blount’s title was not,, in the first instance, good. It does not lie in the mouth of McKay or his representatives to say to the heirs of Blount, “You have forfeited your rights by your laches.” Whose fault was it? Whose duty was it to make returns, and communicate, from time to time, with Blount and with his heirs?
 

 Per CubiaM.. Thei'e will be a decree for the plaintiffs.